In the matter of B. F. MOORE, Esq., THOMAS BRAGG, Esq., E. G. HAYWOOD, Esq., and others.

A court has power to require members of its Bar to purge themselves from a charge of *contempt* incurred by their publishing, over their names, in a newspaper, libellous matter, directly tending to impair the respect due to its members.

For such persons, under such circumstances, to state that *the Judges of the Supreme Court singly or en masse, moved from that becoming propriety, so indispensable to secure the respect of the people, and throwing aside the ermine, rushed into the mad contest of politics, under the excitement of drums and flags,* if admitted to be untrue, is libellous; and, especially when connected with an inference expressly and immediately drawn in the same paper that such judges *will yield to every temptation to serve their fellow partizans* and *are unfit to hold the balance of justice,* directly tends to impair the respect due to the members of such court.

In a *rule to show cause* why a person shall not be punished for *contempt,* the *actual intention* of the respondent is material, in which respect it differs from an *indictment* for the like offence ; *therefore,* where the respondent meets the words of the rule by disavowing upon oath any intention of committing a contempt of the Court, or of impairing the respect due to its authority, the rule must be discharged.

Where a party is excused, *not acquitted,* under a *rule,* &c., he will be required to pay the costs of such rule.

PROCEEDINGS for Contempt of Court.

Upon Monday the 19th day of April 1869, the following

article appeared in the columns of the *Daily Sentinel*, a newspaper published in Raleigh:

"A SOLEMN PROTEST OF THE BAR OF NORTH CAROLINA AGAINST JUDICIAL INTERFERENCE IN POLITICAL AFFAIRS.

The undersigned, present or former members of the bar of North Carolina, have witnessed the late public demonstrations of political partizanship, by the Judges of the Supreme Court of the State, with profound regret and unfeigned alarm for the purity of the future administration of the laws of the land.

Active and open participation in the strife of political contests by any Judge of the State, so far as we recollect, or tradition or history has informed us, was unknown to the people until the late exhibitions. To say that these were wholly unexpected, and that a prediction of them, by the wisest among us would have been spurned as incredible, would not express half of our astonishment, or the painful shock suffered by our feelings when we saw the humiliating fact accomplished.

Not only did we not anticipate it, but we thought it was impossible to be done in our day. Many of us have passed through political times almost as excited as those of to-day; and most of us, recently, through one more excited; but, never before have we seen the Judges of the Supreme Court, singly or *en masse*, moved from that becoming propriety so indispensable to secure the respect of the people, and, throwing aside the ermine, rush into the mad contest of politics under the excitement of drums and flags. From the unerring lessons of the past we are assured, that a Judge who openly and publicly displays his political party zeal, renders himself unfit to hold the " balance of justice," and that whenever an occasion may offer to serve his fellow-partizans, he will yield to the temptation, and the " wavering balance " will shake.

It is a natural weakness in man, that he, who warmly and publicly identifies himself with a political party, will be tempted to uphold the party which upholds him, and all experience teaches

us that a partizan Judge cannot be safely trusted to settle the great principles of a political constitution, while he reads and studies the book of its laws under the banners of a party.

Unwilling that our silence should be construed into an indifference to the humiliating spectacle now passing around us; influenced solely by a spirit of love and veneration for the past purity, which has distinguished the administration of the law in our State, and animated by the hope that the voice of the bar of North Carolina will not be powerless to avert the pernicious example, which we have denounced, and to repress its contagious influence, we have under a sense of solemn duty subscribed and published this paper:

B. F. Moore,                    Edward Hall,
A. S. Merrimon,                 Z. B. Vance,
E. J. Warren,                   William T. Dortch,
John Kerr,                      F. B. Satterthwaite,
E. G. Haywood,                  Ed. Conigland,
Jos. B. Batchelor,              Jos. J. Davis,
G. V. Strong,        ·          Asa Biggs,.
Thomas Bragg,                   S. C. Latham,
Spier Whitaker, Jr.,            C. M. Cooke,
E. T. Branch,                   Wm. F. Green,
Wm. A. Kerr,                    J. T. Littlejohn,
Thomas N. Hill,                 M. V. Lanier,
T. J. Sparrow,                  Jno. W. Hays,
Rich'd Watt York,               T. B. Venable,
George Wortham,                 J. S. Amis,
G. W. Blount,                   L. C. Edwards,
John H. Thorpe,                 Wm. K. Barham,
B. H. Bunn,                     E. H. Plummer,
Samufl T. Williams,             Wm. A. Jenkins,
A. M. Moore,                    W. A. Montgomery,
O. A. Coke,                     C. W. Spruill,
Abner J. Williams,              R. B. Watt,
T. E. Skinner,                  Jno. H. Dillard,
Willis Bagley,                  T. Ruffin, Jr.,

Thos. H. Gilliam,
Thos. J. Jarvis,
Mills L. Eure,
John Gatling,
H. A. Gilliam,
G. H. Gregory,
J. Edwin Moore,
Wm. F. Martin,
E. B. Withers,
J. E. Boyd,
G. M. Whiting,
C. M. Busbee,
H. W. Husted,
J. W. Sharp,
Henry R. Bryan,
Alex. Justice,
W. D. W. Stevenson,
John Hughes,
W. J. Rasbury,
John W. Dunham,
Jas. S. Woodard,
Hugh F. Murray,
J. E. Shepherd,
Geo. W. Whitfield,
J. W. Lancaster,
Ed. C. Yellowley,
Thos. J. Hadley,
John S. Harris,
Sion H. Rogers,
Wm. Eaton, Jr.,

A. M. Scales,
A. J. Boyd,
J. I. Scales,
R. H. Ward,
J. T. Morehead, Jr.,
M. S. Robbins,
M. McGehee,
James A. Graham,
Geo. N. Thompson,
Saml. P. Hill,
L. R. Waddell,
R. J. Lewis,
E. S. Parker,
J. H. Abell,
L. W. Humphrey,
S. Galloway,
W. G. Morrissey,
Wm. Robinson,
Stephen W. Isler,
E. S. Wooten,
J. W. Edmondson,
J. F. Wooten,
F. C. Roberts,
John N. Washington,
Charles C. Clark,
E. A. Osborne,
John E. Brown,
A. Burwell,
Loverd Eldridge,
C. B. Sanders.

Upon the second day of the present term (Tuesday, June 8th, 1869) the following Order was made by the Court :

" The Court being informed of a certain libellous publication directly tending to impair the respect due to the authority of the Court, which appeared in the *Sentinel,* a newspaper published in Raleigh, on the 19th of April 1869, and is headed

"A solemn protest of the Bar of North Carolina" &c., and purporting to be signed by certain attorneys of this Court; the Clerk is hereby ordered to inquire and report to the Court which of the persons whose names appear to be signed to said publication, are attorneys practicing in this Court."

Thereupon the Clerk reported the following names as those of gentlemen who, as appeared by the records of the Court, were practicing attorneys therein, viz :

B. F. MOORE, THOMAS BRAGG, E. G. HAYWOOD, SION H. ROGERS, JOS. B. BATCHELOR, A. S. MERRIMON, H. A. GILLIAM, E. J. WARREN, JOSEPH J. DAVIS, WILLIAM A. JENKINS, C. M. BUSBEE, WILLIAM EATON, Jr., W. K. BARHAM, ASA BIGGS, ED. CONINGLAND, T. J. JARVIS, GEORGE V. STRONG, C. C. CLARK, J. F. WOOTEN, W. T. DORTCH, JOHN HUGHES, T. B. VENABLE, R. W. YORK, JOHN KERR and Z. B. VANCE.

Upon the return of the Clerk's report, the Court ordered that the attorneys named therein should be "disabled from hereafter appearing as attorneys and counsellors in the Court, unless they shall severally appear on Tuesday, June 15th 1869, and show cause to the contrary ;" and further ordered, that a copy of the order should be served upon the parties referred to.

This rule, by direction of the Court, was in the first instance, served (June 9th 1869) upon Messrs Moore, Bragg and Haywood only. Upon its return, the Court made the following remarks :

PEARSON, C. J. As there seems to be some misapprehension, in regard to the matter which the Court is about to take up, it is proper to say that the Rule was made upon the ground that every member of the Bar whose name purports to be signed to the paper referred to in the Rule, did sign it, and approve of its publication.

We are informed that there are about five hundred members of the Bar, and the Clerk reports that the names of one hundred and ten, or, about one-fifth of the whole number, purport to be signed to the paper.

He also reports that Willis Bagley, Esq., has filed a statement to the effect that he did not sign the paper, or authorize any person to do so for him, and that he did not approve of its publication.

The rule is therefore discharged as to Mr. Bagley; and it will be discharged as to all others who may file with the Clerk a like statement.

The Clerk further reports that one hundred and one members of the Bar had an appearance at the last term of this Court. Of these seventy-six did not sign the paper. The names of twenty-five purport to be signed to it: that is, *one-fourth* of the whole number.

For the purpose of showing that the Justices have no disposition to carry matters to an extreme, or to do more than what is, in their opinion necessary to preserve the respect due to the Court by its officers, and to prevent its usefulness from being impaired, (less than which they cannot do, without betraying the confidence reposed in them by the people of the State,) and also for the purpose of avoiding useless costs, the Clerk has been instructed to issue copies only to Mr. Moore, Mr. Bragg and Mr. Haywood, in the first instance, with the hope that further action in respect to others might become unnecessary. Otherwise copies will issue, and a day be given to them.

The Clerk will enter this upon the record.

The matter having been continued to Wednesday the 16th, answers upon oath in the terms following, were filed severally by the respondents above named :

The several answer of ——— to the Rule herein made by said Court, and served upon him.

This Respondent, protesting that a Rule which deprives him even temporarily of his privileges as an attorney of said Court, ought not to have been made in his absence, without notice, and without affidavit or other legal proof of the facts upon which said Rule is based, respectfully answering says :

1. That he admits the signing and publishing of the paper

called "A solemn Protest of the Bar of North Carolina against Judicial interference in political affairs," but insists that the Supreme Court hath no authority to make, or jurisdiction to enforce said Rule :

2. That the publication referred to in said Rule is not libellous, and doth not tend to impair the respect due to the authority of said Court.

3. And for further answer, this Respondent says that said paper was conceived and prepared during the recent political canvass for the Presidency, and its publication deferred until after the close of the canvass, to avoid its having the appearance of a partizan document. He admits that his purpose was to express his disapprobation of the conduct of individuals occupying high judicial stations ; yet as an act of justice to himself against the charge made in the Rule, he not only disavows, in signing and publishing said paper, any intention of committing a contempt of the Supreme Court, or of impairing the respect due to its authority, but on the contrary, avows his motive to have been to preserve the purity which had ever distinguished the administration of justice by the Courts of this State.

Thereupon the Rule was argued on behalf of the Respondents, by Messrs *Battle, Person, Fowle, Barnes* and *Smith.*

Upon Saturday the 19th day of June the Court delivered its opinion as follows :

PEARSON, C. J. The protestation with which the answer opens, is irrelevant to any matter for consideration at this stage of the proceeding, and would not be noticed save that it is calculated to create prejudice in the minds of persons who do not understand the meaning of terms used in judicial proceedings—" laymen" as brother Battle termed them.

This was a rule *nisi,* to-wit: that Mr. Moore, and other gentlemen, be disabled from hereafter appearing as Attorneys in this Court, unless they shall severally appear, on Tuesday, the 15th of June, 1869, and show cause to the contrary; and it was ordered that a copy be served on said Attorneys.

The effect of the rule was to deprive Mr. Moore of his privileges as an Attorney of this Court until the matter was disposed of. No application was made to alter the form of the rule. Suppose it had been, and the rule put in this shape : Ordered, that notice issue to B. F. Moore, Esq., Attorney, &c., to appear on Tuesday, the 15th inst, and show cause why he shall not be disabled, &c., it would have had the effect of depriving him of the privilege of appearing as an Attorney in this Court until the matter was disposed of. For the order would not have been made except upon *prima facie* evidence to support it. So, in either form, the effect would have been to deprive Mr. Moore " temporarily of his privileges as an Attorney of this Court," a necessary incident of the proceeding in either form. Consequently, the *form* of the rule is no legitimate ground for complaint.

The other objection, that the rule was made without affidavit, or other legal proof of the facts upon which it is based, is equally untenable. It is admitted that where the proof is furnished by the senses of the Judges, it may be acted on. Here there was such proof. We knew by our senses that a newspaper containing the paper referred to, purporting to be signed by Mr. Moore and others, had been extensively circulated and was then in the court room ; and the want of a disavowal on his part, that he had signed the paper, or consented to its publication, furnished *prima facie* proof, not sufficient for *final* action, but all sufficient as ground for the rule. On his appearance he was at liberty to deny the fact without an oath, and the denial, like the plea of " not guilty," would simply have put the fact in issue—and he would have been entitled to have the rule discharged, unless the fact was proved by *direct testimony*. Instead of that, he *admits* the fact, So this is no legitimate ground of complaint. In short, all the preliminary objections were waived, and the reference to them can answer no useful purpose.

I. "The Respondent insists that the Supreme Court hath no authority to make, or jurisdiction to enforce, said rule." This position is put on the ground that the statute, ratified 10th of

April, 1869, defines all matters of contempt, fixes the punishment, fine or imprisonment, or both ; and, by *implication,* ousts the common law jurisdiction of the Court over the morals and behavior of its Attorneys.

We agree with the learned counsel of the Respondent in the opinion that the statute does not embrace our case. It is not embraced by subdivision 8, section 1 : " Misbehavior of any officer of a Court in any official transaction," as receiving money and failing to pay it over. So the question is, are the Courts deprived, by implication, of the power of self protection and the means of relieving themselves from the presence of unworthy Attorneys, or those Attorneys who, by combination, (I will not use the harsher word, conspiracy,) seek to impair the dignity and veneration, with which the judiciary is invested, by which it can command the respect and confidence of the public,—without which, its usefulness will be greatly impaired, or altogether destroyed ? A mere statement of the proposition is sufficient to show that the statute has not that effect.

By another statute, persons who apply for the *exclusive privilege* of Attorneys at Law, and the right to enjoy the emoluments of the dignified position of "a member of the Bar," are required to produce satisfactory testimonials of good moral character, and thereupon the law tacitly annexes a condition whereby this exclusive privilege is forfeited after bad conduct ; and it is not only the right, but the duty of the courts, to enforce the forfeiture. Suppose an Attorney of a Court is tried and convicted of " forgery," and the day after enduring *infamous* punishment, appears in Court ; is he to be allowed to exercise the privilege of an Attorney, and has the Court " no power to make, or jurisdiction to enforce " a rule to show cause why he shall not be disabled from appearing before it ? Or, suppose two or more Attorneys are convicted of a conspiracy, which is an infamous offence ; or of a libel, which is also an infamous offence, has the Court no power to rule them out ? No one will venture to question the power or duty of the Court to do so. It may be said these are extreme cases ;

true, but if the statute does not oust the Common law jurisdiction in such cases, the learned gentlemen must yield the position taken by them.

These cases presuppose trial and conviction for an offence where the Conrt has no further concern than to preserve the purity of its Bar. But the power and jurisdiction of the Court apply with equal clearness to cases where the integrity *of the Court itself is assailed* by a libellous publication made by a combination of a part of its Bar, which, in the argument of this point, is to be assumed to be our case. Under these circumstances, the principle of self-protection, the broad ground on which the whole doctrine rests, calls into action the powers of the Court, as soon as there is *prima facie* evidence of the fact, without waiting for a trial and conviction in another Court,—like the case of mutiny among a crew. The Captain must put a stop to it at once, else he betrays the confidence reposed in him ; or, the case of the head of a family who finds some of its members combining to injure, or to bring him into disrepute, he must rebuke it at the outset, if he would preserve the influence and control necessary for the good of the family.

II. The Respondent insists "that the publication referred to, is not libellous, and doth not tend to impair the respect. due to the authority of the said Court."

The paper is drafted with all the adroitness of a skilful lawyer ; and, under cover "of love and veneration for the *past* purity which has distinguished the administration of law in our State," aims a deadly blow at the Court to which that sacred trust is *now* confided.

Stripped of the beautiful dress by which it is artfully disguised, it amounts to this : A Judge, who openly and publicly displays his political party zeal, renders himself unfit to hold the "balance of justice ;" and whenever an occasion may offer to serve his fellow partizans, he will yield to the temptation, and the "wavering balance will shake."

"Never before have we seen the Judges of the Supreme Court, singly or *en masse*, rush into the mad contest of politics, under the excitement of drums and flags," *therefore*, the

Supreme Court, which is composed of these Judges, is " unfit to hold the balance of justice," and will, on occasion, yield to temptation in favor of a fellow partizan.

If you hurt the head, or arm, or leg, or limb, or member, or any part of the body, you hurt the man. And the idea of an intention to injure the character of the Justices who compose the Supreme Court, singly or *en masse*, without an intention to injure the Court, is simply ridiculous.

The only allegation of fact on which this " solemn protest " rests, is that " the Judges, single or *en masse*, did rush into the mad contest of politics, under the excitement of drums and flags."

Is this allegation of fact true, or is it false ? There is no pretence that it is *true*. It is said, this is a figure of speech, suggested by something that was expected to occur, but never did occur ; so the allegation of fact is false, and the inference drawn from it is also false.

In our judgment the paper is libellous, and " doth tend to impair the respect due to the authority of the Court."

Indeed, the learned counsel did not press this point, and were content to take the ground that there was no *criminal* intent.

Every man is presumed to intend the natural consequence of his act. If one wilfully sets fire to his own house, which is so near his neighbor's house, that if one burns the other must burn also, and both houses are burnt down, the man is guilty of arson—the criminal intent is presumed. So, in an indictment for libel, this ground would be untenable, except on proof of insanity.

"III. And for further answer this Respondent says, that said paper was conceived and prepared during the recent political canvass for the Presidency, and its publication deferred until after the close of the canvass, to avoid its having the appearance of a partizan document. He admits that his purpose was to express his diapprobation of the conduct of individuals occupying high judicial stations, yet, as an act of justice to himself against the charge made in the rule, he not only dis-

avows, in signing and publishing said paper, any intention of committing a contempt of the Supreme Court, or of impairing the respect due to its authority, but, on the contrary, he avows his motive to have been to preserve the purity which had ever distinguished the administration of justice by the Courts of this State."

The learned counsel then fell back on the ground of a distinction between an *indictment for a libel* and a rule *nisi* to show cause, and assumed, as a matter of law, that in this case the Respondent having, on oath, disavowed any intention of committing a contempt of the Court, or of impairing the respect due to its authority, so as to meet the words of the Rule, it must be discharged. The authorities cited by the learned counsel are conclusive. The law is well settled in this class of cases, *where the intention to injure constitutes the gravamen.*

The Rule rests on sound reason. In this proceeding, as the Court is judge in its own case in the *first* instance, where a case is made out in the judgment of the Court, the party in the *last* instance is allowed to *try himself.* His *intention* is locked within his own breast, is known to himself alone, and he is permitted to purge himself by his own avowal. He cannot be convicted, *if he is innocent*, as he may be *by false evidence, before a jury.* For the Court does not try him, he tries himself." C. J. Wilmot's Opinion, 257-8, referred to on the trial of Judge Peck, 507. If the party, after the Court decides against him, declines to *try himself*, it must be because *he knows himself to be guilty.*

It affords every member of the Court pleasure that the Respondent did not decline to make a sufficient disavowal on oath. We agree with the learned counsel that this disavowal *meets the words of the rule;* but we must say, it seems to us in bad taste to have introduced the expression, "he admits that his purpose was to express his disapprobation of the conduct of individuals occupying high judicial stations."

This is so vague that the Court is unable to give to it a positive meaning; and yet, it seems to imply that in taking the

oath the Respondent meant something which he hesitated to express, lest it might be taken to neutralize the legal effect of his disavowal. The concluding words of the oath are enough to express the purpose which the Respondent avows he had in view, and the vague words referred to may be treated as surplusage. This presented the only difficulty to coming instantly to our conclusion, that the disavowal is sufficient.

We concur with his counsel in according to Mr. Moore high encomium for his ability, legal learning, integrity, devotion to the Constitution, unwavering love of the Union, and *hitherto* most consistent and influential support of the judicial tribunals of his country.

The motion to discharge the Rule is allowed, on payment of costs, a case having, in the judgment of the Court, been made against the Respondent, so as to call for a disavowal on his part. It is proper that he should pay the costs. He is not acquitted, but is excused.

PER CURIAM.                                       Rule discharged.