## WILLIAM BIGGS, *ex parte.*

The proper method of bringing before the Supreme Court for review, the the order of a Superior Court in regard to alleged misconduct by one of its officers, (*here*, an attorney), is by bringing up the *record proper* of such Court, by a *certiorari in the nature of a writ of error.*

A *mandamus* in such case, would be improper.

The party charged in such case, has no right to *appeal.*

(*Brooks* v. *Morgan,* 5 Ire. 481, *Commissioners of Raleigh* v. *Kane,* 2 Jon. 288, cited and approved.)

---

A Court has power, on the ground of self protection, outside of the common law and statutory doctrine of *contempt,* to disbar an attorney who has shown himself unfit to be one of its officers ; and such unfit-ness may be caused not only by *by moral delinquency,* but by *acts* (*here*, a publication) *calculated and intended to injure the Court.*

If an attorney who is also an editor of a newspaper, and who in his latter character writes an article in disparagement of the Court, be put under a rule by such Court, he may by answer raise the point, whether a *prima facie* case has been made out against him and he be *called on* to make a disavowal,—but where, (*as here*) he does not take that course, but *elects to disavow,* the case does not present the question, Whether an editorial written by one who is an attorney as well as an editor, falls under *general principles* governing cases of misconduct by attorneys of the Court.

Where, in such a case, the respondent submitted to *try himself,* and filed a disavowal in these words, "This respondent respectfully answers : That as an attorney and counsellor in this Court, he has ever been re-spectful, both in his deportment and language, to his Honor Judge E. W. Jones, and disavows *having ever entertained* any intention of committing a contempt of the Court, or any purpose to destroy or impair its authority, or the respect due thereto." *Held,* that although (in the expression italicised) more general than there was occasion for, the disavowal was sufficient to *excuse,* if not to *acquit ;* even although in a subsequent paragraph the respondent *insisted,* that the article was not libellous; that, by becoming an attorney he had not lost his rights as an editor ; that, the article was written in the latter character ; and that, it did not transcend the limits to criticism upon public men, al-lowed to the freedom of the press.

(*Ex parte* Moore, 63 N. C, 397, cited and approved.)

CONTEMPT of court by an attorney, adjudged by *Jones, J.,* at Fall Term 1869 of EDGECOMBE Court.

During the present term, on the 8th day of February, a petition under oath, was filed in this court by William Biggs, late an attorney of the courts of the State, alleging that at Fall Term 1869 of Edgecombe Court, an order had been made by his Honor Judge Jones, then and there presiding, by which, for an alleged contempt of court, he had been *disbarred ;* setting forth a transcript of the record in the case, and praying for a *mandamus,* that the said Judge allow him to practice law as heretofore.

The application was presented by Messrs. *Moore, Graham, Bragg and Fowle* & *Badger,* of counsel for the petitioner, and having been argued, the court delivered the following opinion :

PEARSON, C. J. This is a petition for an alternative mandamus, commanding his Honor, E. W. Jones, Judge of the Superior Court for the second judicial district of the State, "To allow the petitioner to practice law in said Court in like manner as theretofore he had been licensed and used to do, or show cause to the contrary."

In presenting the petition, Mr. Graham, one of the counsel of the petitioner, informed the Court that their purpose was to adopt the proceeding most fit and proper to accomplish the end; and that they had concluded to move that notice issue to his Honor, Judge Jones, to show cause why an alternative mandamus should not issue.

The Court desired to hear an argument on the questions : 1. Had the petitioner a right to appeal from the order of his Honor, by which the petitioner was disabled from practicing as an attorney in said Superior Court ? and 2. Is the appropriate mode of proceeding, by the writ of *mandamus,* or by a writ of *certiorari ?*

After hearing a full argument by Mr. Graham and Mr. Moore, attorneys in behalf of the petitioner, we are of opinion: 1. That the petitioner did not have the right of appeal, and 2. That the proper remedy is by writ of *certiorari, in the*

*nature of a writ of error*, to bring up the record now remaining in the Superior Court for the county of Edgecombe, so that it may be reviewed, and such proceedings be had thereon as are agreeable to law.

The matter involves the power of a court, and also the right of an attorney of the court to be protected against error in the exercise of power on the part of the Judge.

It is ordained by the Constitution, Art. 4, Sec. 10: "The Supreme Court shall have power to issue any remedial writs necessary to give it a general supervision and control of the inferior courts." The question is: Does the case made by the petition call for the remedial writ of *mandamus*, or can the purpose be met by the remedial writ of *certiorari* in the nature of a writ of error?

The writ of *mandamus* is a high prerogative writ, and is never resorted to except in cases where there is no other mode of attaining the ends of justice. If there be any other remedial writ that will answer the purpose, this court is not allowed to grant the writ of *mandamus;* and we should be reluctant to resort to it in this instance, for surely it would not be seemly, unless there be a positive necessity, to command a Judge of the Superior Court to appear at the bar of this court, and confront in an adversary suit one who has been an attorney of his court, and now demands to be restored to that privilege.

There is this further objection to the writ of *mandamus :* the court in granting it assumes that, *prima facie*, his Honor is in the wrong. If upon the notice, he appears, and relies upon the order still remaining of record and in full force, then this court would be forced to review that order in a *collateral* way, and the order restoring the petitioner to his rights as an attorney, could not have the legal effect of reversing the order in the Superior Court, but would simply be in disregard of it.

The writ of *certiorari* is used for two purposes: *One,* as a substitute for an appeal, where the opportunity for bringing

up the matter by appeal, is lost without laches. It is to *this* that the remarks so forcibly made by Mr. Moore on the argument, as to the difficulty of making up the case, or the *postea* in the record, on bill of exceptions, or from the notes of the Judge, or on affidavits, would fully apply. Such was the case of *Bradley* v. *Fisher*, 7 Wall. 376, and the case of *People* v. *Justices of Delaware*, 1 John. Cases, 181, cited on the argument. In these and the like cases, the court is obliged to resort to the writ of *mandamus*, as the only remedy to meet the ends of justice. But this kind of *certiorari* is not now in question.

*The other* is where the writ of *certiorari* is in the nature of a writ of error, and it is used where the writ of error proper does not lie, *Brooks* v *Morgan*, 5 Ire. 481, *Com. of Raleigh* v. *Kane*, 2 Jon. 288. By this writ, only the record proper is brought up for review, and no *postea* or *case* is to be made up.

Such is our case, for the whole matter rests on error alleged by the petitioner in the proceedings on the record, and nothing can be brought before this court except what appears on the face of the record. The action of this court will be either to affirm or to reverse the order in the court below.

PER CURIAM. Motion for notice to show cause why an alternative *mandamus* shall not issue, refused.

Motion, having the allegations set out in the petition as its foundation, for a writ of *certiorari* in the nature of a writ of error, to bring up the record for review—allowed.

The writ will be returnable forthwith.

———

Thereupon the *certiorari* was issued, and in obedience thereto, the clerk of Edgecombe court returned a transcript from the minutes of the above term, by which it appeared that on Monday the 6th of December, the petitioner had been called upon, by a rule, to show cause upon Thursday the

9th, why he should not "be disabled from hereafter appearing as attorney and counsellor in court," it being set forth, as ground for such proceeding, that, as editor of the *Tarboro' Southerner*, he had published during the term, in the village of Tarboro', an article, which was copied at length, but of which the judgment given below renders it necessary to set forth only this much : that, after referring to the Judge as, (in inverted commas) "His Honor," "Judge" &c., it proceeds to say that the charge to the grand jury was "almost identically similar with the one delivered here six months since, with this important exception, his Honor seems to have somewhat deserted the profane poetical masters, and confined most of his quotations to the Holy Scriptures—a happy omen, if it's possible to believe anything happy in such a character."

Upon Thursday the respondent appeared, and answered under oath :

"1. That as attorney and counsellor in this court, he has ever been respectful both in deportment and language to his Honor Judge E. W. Jones, and disavows having ever entertained any intention of committing a contempt of the court, or any purpose to destroy or impair its authority or the respect due thereto.

2. That he admits the writing and publishing of the article headed 'Edgecombe Superior Court,' in the newspaper, *Tarboro' Southerner*, but insists that he wrote and published the same as editor of said paper, and not as an attorney and counsellor at law, and he further insists that the said article is not libellous, and does not contain any comment as applied to a public elective officer not allowed by the freedom of the press, as defined by the Constitution of the United States.

3. That he insists that by becoming an attorney and counsellor at law, he has not surrendered any right as an editor, and as such he is entitled, according to every republican idea of the 'freedom of the press' to fully comment on all public officers, a right that ought never to be restrained except for abuse, and that, before he is held responsible for any alleged abuse, he is entitled to a trial by a jury of his countrymen."

Thereupon, on Friday, his Honor, being of opinion that paragraph 1, in the answer was not *responsive* to the rule;

and besides, as regards paragraphs 2, and 3, that, by assuming the character of an editor, an attorney was not freed in any degree, from the respect otherwise due to the court, made the rule absolute, and disbarred the respondent.

The respondent asked for an appeal. But the court, thinking that, if he were entitled to one, he would have to conform to the provisions of the Code applicable thereto, declined to consider the motion.

The transcript having been returned to the effect above,—

*Moore*, with whom were *Fowle & Badger*, argued as follows:

1. The common law of England, respecting contempts of court, is the law of this State, except so far as it may have been changed by our political situation, and the act of the General Assembly, concerning contempts, of April 10th 1869.

2. It is confidently submitted, that this act embraces all the matters, which can now constitute contempts of State courts, and utterly displaces the common law upon the subject; just as did the act of Congress of 1831. The great purpose of the Code C. P., was to supersede the existing law, both common and statute, and introduce new rules for judicial action, procedure and practice. This is shown by the radical change in the constitution and laws. as announced by Art. 4, ss. 1, 2 and 3.

The act professes, as well by its title, as by its specific enumeration of causes of contempt, to supersede the existing law, and substitute certain and defined rules for ascertaining and punishing every act, which it intends to regard as a contempt. In this respect, the act follows the policy of many of the States of the Union, and especially that of Congress, as declared in the act of 1831, *Ex Parte Poulson*, 15 Haz. Pa. Reg. 380; and as declared in the act of 1846, ch. 62, of this State, Rev. Code, ch. 31, sec. 113; *Weaver* v. *Hamilton*, 2 Jon. 343. The recent act, in division 7, adds one

other common law cause of contempt to those which were allowed under the act of 1846. This of itself, proves the legislative purpose to assume entire control of the subject, and regulate it thoroughly: For, by the common law, "any publication pending a suit, which reflects upon the court, the jury, the parties, the officers of the court, or the counsel, with regard to the suit, or which tends to influence the decision, is a contempt, punishable by attachment;" *United States* v. *Duane,* Wall. C. C. 102. Peck's trial,—*Ex Parte, Poulson*; while the recent act concerning contempts, specifies, in division 7, in express words, the *sole* cause of contempt under this class to be "*the publication of a grossly inaccurate report of the proceedings in any court.*"

If the court can add *one* other cause, it may add one hundred, and render the act nugatory.

The act concerning contempts is the work of the commissioners appointed by the constitution to provide "*a Code of the law of North Carolina.*" That they offered this act as a substitute for the entire body of law upon the subject, is apparent:

(1.) From the language of the first section, which declares that "any person guilty of any of the following acts may be punished for contempt;"

(2.) From the specific enumeration immediately following, of eight distinct causes of contempt, each of which was a well known cause of contempt at common law;

(3.) From sec. 2 of the Act, which declares and prescribes a *specific punishment* "for contempt"—*all* contempts—of court thus manifestly intending not to leave undefined, or discretionary with the court, either the *causes* of contempts, the *mode* of their punishment by fine and imprisonment, or the *amount* of the punishment;

(4.) In further proof, that the act was intended to dispose of the whole question of contempts, we find that, after contempts are defined, and punished with specific punishments, it is expressly declared, under what circumstances, and be-

fore what magistrates, contempts may be committed; *when* the causes shall be *recorded,* and the *mode* of bringing to trial the guilty party.

The supreme, superior, and inferior judicial officers are all invested with the same powers to commit for contempts, *while sitting in the discharge of official business.* The chapter embraces every necessary legislative provision upon the subject. It declares:

(1.) *What acts* are contempts, and how they are to be punished;

(2.) *By whom,* contempts may be punished;

(3.) *Whom* and *when* courts of record may punish; and

(4.) Allows punishments amply sufficient to protect every court, while engaged in the administration of justice, against every kind of disturbance and imposition from any and every source whatever. What other or higher "powers," in the language of Chief Justice Nash, in *Weaver* v. *Hamilton,* "can a well minded Judge desire to possess, further than is necessary to the proper transaction of the business before him." A contrary construction of the Acts leads to absurd consequences.

The publication complained of, if a contempt, is manifestly a *very* trivial thing compared with many contempts designated by the Act. Now, if the publication be construed to be a contempt, and *out* of the Act, then the punishment, too, is *out* of the Act; and, while for the gravest contempts enumerated in that, a court would be restricted to a small fine and short imprisonment, for all others not enumerated therein, however small, any court, even that of a Justice of the Peace, would be left free to fine and imprison, without limit of amount or time; yea, and to disbar, too, if the offender were an attorney!!!

3. The court below seems clearly to admit that the publication, of itself, was not a contempt of *court:* For, had it been so, then the co-editor, Mr. Charles, would have been equally guilty. Yet he is not noticed in the rule. This

14

construction of the Act, by Judge Jones, as applicable to newspaper publications, at this day and in this State, is doubtless the true one, and is fully sustained by its language, its context, and by the interpretation put on the Act of 1846, in *Weaver* v. *Hamilton*; and on the Act of Congress of 1831, by Baldwin, Judge, *In re Poulson.* But if the publication be not a contempt in Charles, it can be so in Biggs, only because he was an *attorney.*

Such a construction is against reason, because the causes of contempt, which can be committed by Mr. Biggs as an *attorney*, are as distinctly specified in the Act, as those which can be committed by Mr. Charles or Mr. Biggs as a *man ;* and such a publication is not one of the acts specified or embraced in its language or meaning, by the broadest construction in regard to persons or attorneys. If the common law be still open for Biggs as an attorney, it is open also for Charles as a man.

4. If, however, the recent Act respecting contempts, shall be construed so as not to disparage the common law jurisdiction, it is insisted, that the article in the *Southerner*, respecting Hon. Edmund W. Jones, is not a contempt of court.

There is but one paragraph, so far as relates to the Judge, from which any expression of disrespect can be selected, which is as follows:

"His Honor seems to have somewhat deserted the service of the profane poetical masters, and confined most of his quotations to the Holy Scriptures—a happy omen, if it is possible to believe anything happy in such a character."

No exception can be taken to any part of this paragraph other than to what is contained in the words, "a happy omen, if it is possible to believe any thing happy, in such a character."

No definite offensive meaning can be given to the expression. The whole is but light ridicule. Nothing is uttered disrespectful of his *official* action. The repetition by a Judge,

of his charge to the grand jury, is but following the ex-
ample of the illustrious Chief Justice Marshall; and the
allusion to quotations in the charge, of poetry and the
Scriptures, is too trifling for notice, on or off the bench.

5. By the common law of England respecting contempt,
there can be, out of the presence of the Court, no contempt
of Court merely by language spoken or written of the per-
son who may be its Judge, unless such language be spoken
or written in reference to the official acts of the Judge : 4
Bl. Com. from 284 to 296; Charleton's case 14 E. Ch. Rep.
316, at 339 to 343; the *King* v. *Watson* 2 T. R. 199.

There was no allusion in the publication to any official
act, except that of charging the grand jury. Of this charge
it is said only, that there was nothing new in it, except the
substitution of scriptural quotations, in the place of quota-
tions, previously used, from the profane poets.

In order to constitute contempt in other cases, by use of
disrespectful language spoken or written of a person who is
Judge, but not of his official acts, the language must be used
of him *while in the actual discharge of his duties.*

If spoken or written of the *man,* in a place where the
language does not tend to disturb the Court, the words do
not constitute a contempt. See cases cited as above.

6. But if the publication were, *apparently,* a contempt of
Court, the respondent swore that he did not so intend it;
and honestly separated his acts done as an attorney from
those done as an editor.

He made this distinction upon oath; and upon his oath
claimed constitutional rights under the distinction. Sup-
pose that he was mistaken, was not a reprimand from the
bench sufficient, or a fine or imprisonment for a short
time? The punishment inflicted for so venial an offence, if
offence it be, *is unusual and unprecedented.*

7. Attorneys, as to contempt of Court, stand upon the
same footing with all other persons, unless the matter con-
stituting the contempt be connected with the discharge of

the duties of their office as attorneys. *In the case of the executors of Atkins*, 6 E. C. L. 344--5. *In the matter of Knight*, 8, E. C. L. 259. *In re Fenton*, 30 E. C. L. 129. 1 Salk 87, Pl. 5. *Cocks* v. *Harman* 63 East, 404. Bac. Abr. Att. (A) and (H.)

The office of an attorney, and the vocation of an · editor are wholly unlike.

8. If the contempt be of a character, which degrades and dishonors the moral standing of the man, and renders him unfit to practice as an attorney, such a contempt may perhaps, authorize a disbar without trial by jury. As if an attorney allow a person who is not an attorney to practice in his name; such conduct in England (always exceedingly careful of the integrity of her attorneys) is, (by statute 12 Geo. 2, c. 13, §11) regarded as so gross a fraud and deception upon the public and the office of attorney, as to evince and proclaim a want of moral *status* in the attorney thus allowing the use of his name and the abuse of the office, Bac. Abr. Atty. (A)·p. 290. *In re Isaackson* and others, 17 E. C. L. 106.

9. An attorney, who simply. commits a disgraceful and degrading act, which is not connected with his profession, is not guilty of a contempt of court. Sergt. Hawkins in his learned work on crimes, treats at large of contempts to Courts; and under all the classifications of which they are susceptible. In B. 2, ch. 22, he notices all such as may be committed by attorneys in the discharge of their official duties, and among them, *forgery of records*, &c. For these and, every species of *contempt* of Court, he declares the legal *punishment* to be fine and imprisonment. He nowhere notices disbarring, or striking from the roll, as a *punishment* for the misconduct of attorneys.·

10. If an attorney, by an act of infamy, lose his moral *status*, he is not struck from the roll because of *contempt of Court*, but "to keep free from reproach the profession of which he is a member." *Ex parte Brounsall* Cowp. 829, 1

Ch. Cr. law 660. 1 Tidd 89. *The King* v. *Southerton* 6 E. R. 143. Jeromes case Cr. Ch. 74. *Ex parte Stokes* 18 E C. L. 303 and notes (Ed. of 1856.)

11. No practising attorney ought to be disbarred or struck from the roll, unless unfit to be entrusted with professional *status* and character; or "found guilty of moral delinquency in his private character. *In re Wallace* 1 Priv. Council Cases, 283 (1866.) *Ex parte* Burr 9 Wheat. 529. *Ex parte* Brounsall.

Even under the common law in England, writing "a letter addressed to the Chief Justice of a Court, reflecting on the Judges, and on the administration of justice generally in the Court," although a letter of "a most reprehensible kind," and a contempt of Court which it was hardly possible for the Court to omit taking cognizance of," furnishes no evidence of any sufficient *delictum* or of moral delinquency in private character, or of the want of "professional *status* and character," which renders it expedient for the public interest, or protection of the Courts, to interfere with the *status* of the individuals as a practitioner in the Court;" as is expressly held, *In re Wallace.*

The case of *Brounsall* represents the opinion of all the Judges of England in 1778, while that of *Wallace* is the judgment of the highest Court in England in 1866. The law in both is the same, and is now and ever has been the law of this State.

12. The idea of striking a practising attorney from the roll for a contempt of Court, which does not gravely affect his private character as a gentleman and a man of worth, is contrary to all English precedent.

13. The privilege to practice law, is an office, and is protected as property, 4 Bac. Abr., *Mandamus* (C.) *In Re Wallace, Ex Parte Bradley. Ex parte Burr.* Disfranchisement of ones office, for mere contempt unaccompanied with a loss of moral status, is a " cruel and unusual punishment," unknown to, and forbidden by, the common law of England *In Re Wallace—Baggs* case, 11 Rep. 93.

Such disfranchisement is a deprivation of the means of living ; and as a punishment is forbidden in England by those parts of *Magna Carta*, which constitute parts of our own Constitution in Sections 14 and 17. I conclude, therefore

1. Every contempt, which can be lawfully noticed by a Court or other body acting judicially, is described in the act of April 1869, " concerning proceedings in contempt."

2. No contempt can be punished otherwise than is therein prescribed : to-wit, by fine or imprisonment, or by both—the fine not to exceed $250 ; the imprisonment not to be more than 30 days.

3. There is no rightful power to disbar a licensed practitioner but for the loss of moral *status*, that is, that the person is unfit to be trusted to discharge the high duties of an attorney.

4. If, in the investigation of a cause of contempt, such proof of moral delinquency, connected therewith shall appear, as to show the person to be unfit to practice, then the Court may punish for the contempt, and may also disbar, to rid the public of a faithless man who has become " a reproach to the profession of which he is a member.

PEARSON, C. J. The subject of " the power of Courts, and the rights of attorneys," would seem to be exhausted by the elaborate argument of the counsel for the respondent. The want of some " student of the law" on the other side of the question, equally diligent with Mr. Moore, is met by the very full *expose* of the result of his examination of the cases.

The power of the Court, on the ground of self protection, outside of the common law doctrine, and of the statute in regard to *contempts,*—to disbar an attorney, who has shown himself unfit to be one of its officers, although earnestly contested on a former argument by six learned members of the bar, is now conceded.

So, the principle is settled ; and the only difference of opinion, is in respect to its application.

Biggs, *ex parte.*

On the side of the respondent, it was insisted, that the principle applies only to cases of *moral delinquency*; as, if an attorney be convicted of crime, say forgery—or, if, without a conviction it appears to the Court, upon an investigation had before it, that an attorney is guilty of gross fraud; say, by making corrupt misrepresentations to his client, and obtaining an assignment for an inadequate consideration.

But we hold that the principle embraces also, cases where an attorney makes a publication calculated to injure the court, and *intended by him* to have that effect—"an evil bird bewrayeth its own nest." The court has power to rid itself of one, who thus proves that he is not fit to be trusted as one of its officers.

If the attorney, when called on, disavows the *criminal intention,* that is an end of the proceeding:—should he be unable to make this disavowal, the only alternative, is an order to strike his name off of the roll.

We were pleased to hear the hope expressed on the argument, that this discussion might induce a better state of feeling. This tender of a return to good feeling, is cordially accepted.

Since the principle is now conceded, and there is only some difference of opinion as to its application, we presume the public mind will be relieved from fear of usurpation of power by the court, and of "*judicial tyrany.*"

In our case, the facts not being controverted, it was, in the *first place,* a question of law for the court: Was the publication calculated to injure the court, and destroy its usefulness? The article refers to Judge Jones in his official character, and is calculated to hold the court up to ridicule, and thereby injure and bring it into disrepute. But it purports to be by the editor of a newspaper—has no reference to Mr. Biggs as an attorney of the court, and does not seek to attach to the publication any additional importance, by reason of the fact, that besides being an editor of the newpaper, (it would be the same as to a merchant or a farmer, except that an editor

of a newspaper has greater facility for publication,) he is also an attorney of the court. This fact, however, being known to his readers, was calculated to add to the force of the article.

There is a marked difference between this article, and one *purporting* to be published by an attorney of the court; and an exceeding difference between a mere editorial of a newspaper, and a solemn Protest, published by a combination and confederacy of many attorneys, assuming to act as the Bar of the State of North Carolina. In this view, perhaps it might have been as well if his' Honor had not noticed the article, and had allowed it to pass as a "newspaper squib." But he felt it to be his duty, as a court, to put Mr. Biggs, one of its editors, under a rule. Mr. Biggs, if so advised, had the right, in answer to the rule, to raise the question, that a *prima facie* case was not made out, and that he was not called on to make a disavowal. But he elected to make a disavowal. So the question: Whether an editorial article, when the editor of the newspaper is also an attorney of the court, falls under the principle, is not presented by the record.

This court is not at liberty to go out of the way, in order to express an opinion upon it.

In *Ex parte Moore*, 63 N. C. 397, the court says : "The rule rests on sound reason. In this proceeding, as the court is judge in its own case in the first instance, when a case is made out in the judgment of the court, the party, in the last instance, is allowed to *try himself.* His *intention* is locked within his own breast ; is known to himself alone, and he is permitted to purge himself by his own disavowal. He cannot be convicted if he is innocent, as he may be by *false evidence* before a jury. For, the court does not try him; he *tries himself.* C. J. Wilmot's Opinions, 267–8, referred to in the Trial of Judge Peck, 507. If the party, after the court decides against him, declines to *try himself*, it must be because he knows himself to be guilty.

Mr. Biggs submitted to "try himself," and filed a disavowal in these words : "This respondent respectfully answers :

1. That as an attorney and counsellor in this court, he has ever been respectful, both in his deportment and language, to his Honor, Judge E. W. Jones; and disavows having ever entertained any intention of committing a contempt of court, or any purpose to destroy or impair its authority, or the respect thereto."

Had the answer stopped here, there would have been no difficulty, and the rule would have been discharged, "as of course."

The matter set out in the subsequent part of the answer (as it is termed), might have been relevant in the first stage of the proceeding: in order to show that a "*prima facie* case*" was not made, and consequently, that the party could not be required to make a disavowal. But the disavowal had already been made: so this matter was supererogatory, and had no bearing at that stage of the proceeding, after the party had tried himself. Its only tendency was to " embarrass the question." And so much confusion is thrown on it as to have led his Honor into error. He holds: " The first clause of the answer is not responsive to the rule, because it does not particularly disavow an intention to impair the respect due to the authority of the court by the publication of the article referred to." The respondent disavows "*having ever entertained* any intention of committing a contempt of the court, or any purpose to destroy or impair its authority, or the respect due thereto."

True, this disavowal is more general than it need to have been; and its generality may have been intended to weaken its force. But still " the greater includes the less," and there is a disavowal, included in the general words, of an intention by the publication of the article in the newspaper, to commit a contempt of the Court, or of any purpose to destroy or impair its authority or the respect thereto. We think this in substance responds to the rule.

This proceeding is one of a peculiar nature, of necessity. The Court is to some extent, a judge in its own case, hence,

when the respondent submits to "try himself," and a disa-
vowal is made on oath, the Court must accept it, and is not
allowed to call in question, the truth or the sincerity of the
disavowal.    There is no mode of trying such questions; and
they are left "to the Searcher of all hearts"

The disavowal entitles the respondent to be excused, or
acquitted, and the effect in either view is to discharge the
rule.

There is error in the ruling of the Court below.    Order
reversed, and Rule discharged.

PER CURIAM.                                    Error.