[No. 6170.]

## HAMMA v. THE PEOPLE.

1. **Words and Phrases—"Ministerial."**

    The word "ministerial" means "pertaining to executive offices as distinguished from judicial; administrative."—P. 407.

2. **Same — Ministerial  Duty — Imposed  by  Statute — Judicial Functions.**

    The mere fact that a ministerial duty is imposed upon a judge by statute does not necessarily make it a judicial function; such functions being determined by the intrinsic character of the duty or act itself, and not by the character of the officer designated to perform it.—P. 407.

3. **Same—How Performed.**

    An act in the performance of a ministerial duty is imperative, and is done in obedience to some legal mandate, and involves the exercise of no official discretion and of no judgment as to the propriety of the act, thereby differing entirely from an act in the performance of judicial duties.—P. 407.

4. **Same—Judges—Duties—Statutory Construction.**

    The duties imposed upon a county judge by Mills' (Rev.) Stats., §§ 1936z, -a1, -b1, requiring him to keep an accurate account of all fees and emoluments of his office, and to make a report thereof to the board of county commissioners, who shall audit and adjust the same, which provisions are also made applicable to county clerks and other ministerial officers, are purely ministerial, since, if the duty constituted a judicial function, the performance thereof could not be supervised and controlled by the county commissioners.—P. 409.

5. **Contempt—Publications—Judges—Performance of Ministerial Duties—Nature of Remedy.**

    The fact that a publication reflecting upon the manner in which a county judge performs certain ministerial duties imposed upon him by statute, if false or malicious, may cause him

to suffer injustice and injury in his official, as well as in his private, capacity, does not furnish a basis for contempt proceedings against the author of the publication, since the extraordinary remedy by proceedings in contempt is given primarily to safeguard the interests of parties to judicial proceedings, and for the purpose of protecting the court itself from coercion or interference while in discharge of its judicial duties.—P. 410.

*Error to the County Court of Teller County.*
*Hon. Thornton H. Thomas, Judge.*

H. M. Hamma was convicted for contempt of court, and brings error.

> *Reversed and remanded, with*
> *directions to dismiss.*

Decision *en banc,* Mr. JUSTICE GABBERT, Mr. JUSTICE GODDARD and Mr. JUSTICE BAILEY dissenting.

Messrs. WHITTED & DINES, Mr. C. C. BUTLER and Mr. L. G. CAMPBELL, for plaintiff in error.

Mr. WM. H. DICKSON, attorney general, Mr. HORACE PHELPS, deputy attorney general, and Mr. THEODORE H. THOMAS, for the state.

Plaintiff in error was tried and convicted for a contempt of court. Such trial and conviction were based upon the following circumstances:

The statutes of the state require certain county officers, including the county judge, to keep an account of all fees, emoluments and expenditures connected with their offices; in the same manner such officers are required to make a monthly report to the board of county commissioners showing the condition of such accounts; these accounts must also, by virtue of the statute, be always open to inspection and examination by the board of county commissioners, and the duty is expressly imposed upon that board to audit, correct and adjust the same in accordance with the facts.

The statutes referred to read as follows:

1936z  "The several officers herein named shall from the time of the passage of this act, each of them, in a book provided for that purpose, keep a full, true, accurate and minute account of all fees and emoluments of his office, designating in corresponding columns the amount of all fees and emoluments earned, and all payments received on account thereof, and shall also keep an account of clerk hire and other necessary expenses. Such accounts shall always be open to the inspection and examination of the board of county commissioners."

1936a1.  "The county judge, clerk of county court, county treasurer, sheriff, county clerk, justice of the peace, and constables shall, on the first Monday of each month during his term of office, and while receiving a salary, as herein provided, make to the chairman of the board of county commissioners, a report in writing under oath, of all the fees, commissions and emoluments of his office, of every name and description whatsoever, and of all necessary expenses of clerk hire and other expenses, for the month ending at the time of said report. Such report shall state fully the manner in which such fees and emoluments accrued."

1936b1.  "It shall be the duty of said board of county commissioners to audit such accounts as soon as may be, and correct and adjust the same in accordance with the facts."

In the year 1906 plaintiff in error was employed by the county commissioners of Teller county as an expert accountant to examine the accounts of the different county officers mentioned in the statute and report the result of his examinations to the board. Upon investigation of the accounts of the county judge, plaintiff in error, among other things, reported that the books of this official had been kept

in a careless manner and it was difficult to determine therefrom the exact amount of cash on hand at any particular time; but that there seemed to be a shortage, stating the amount of such shortage.

The correctness of this report was at once denied by the county judge and further investigations through the medium of the grand jury and otherwise, ensued. Some difficulty arose in distinguishing between the accounts of the county judge and those of the clerk of the county court. But the last expert accountant, who was selected and appointed by the county judge himself, ultimately attested the accuracy of the accounts of both judge and clerk, and concluded that no shortage existed in either.

An article was published in one of the Cripple Creek papers severely reflecting upon the plaintiff in error, and among other things, challenging his ability as an expert accountant. This article was assumed by him to have been inspired, in part at least, by the county judge. And responding thereto, he wrote and published the communication which is the foundation for the present contempt proceeding.

Thereupon the clerk of the county court filed in said court an affidavit reviewing the circumstances and including the newspaper article thus written by plaintiff in error. A citation was then issue charging plaintiff in error with contempt of court. He appeared and filed a lengthy answer in which he admitted writing and publishing the communication, but denied any intent thereby to obstruct the administration of justice, to bring the county court into disrepute or to cause any reflection upon the county judge in his judicial capacity.

The cause was brought on for trial before the county court, evidence was taken and an extended hearing was had, plaintiff in error being found guilty and adjudged to pay a fine of $500.00 and suf-

fer imprisonment in the county jail for the period of ten days.

In view of the conclusion reached by this court, it is unnecessary to incorporate into the present statement either the pleadings or the newspaper publication upon which the contempt proceeding was based. In so far as the contents thereof are necessary or important, the substance is sufficiently stated in the opinion.

Mr. JUSTICE HELM delivered the opinion of the court:

Plaintiff in error was tried, convicted and sentenced for an alleged contempt of court in the publication of a certain newspaper article. This article resulted from a controversy growing out of the action of plaintiff in error as an expert accountant employed under the statute by the county commissioners of Teller county to investigate and report upon the accounts of certain officers, including the county judge. The method employed in keeping the account of fees, emoluments, expenditures, etc., which the statute requires that official to keep, together with certain shortages charged as appearing therein, were the foundation of the entire controversy.

No facts are stated in the affidavit or information upon which the attachment issued, or in the return or answer thereto by respondent, reflecting upon the county judge in his judicial capacity. Nor is there any reference in the publication itself to any judgment, order, or proceeding pending or determined, in relation to causes, estates or other matters requiring judicial action by that court or judge. The concluding words of this article, to which exception is specially taken, referring to the misuse of public funds by a "public official," clearly relate, as we

shall presently see, to the judge's action in performing a purely ministerial duty.

Under these circumstances, it seems to us that the honorable county judge misconceived the remedy provided by law for such injuries as he may have suffered through the publication mentioned. We are of opinion that the issuing of an attachment for contempt was not only erroneous, but was in excess of the jurisdiction possessed by the court.

The proposition will hardly be disputed that in this class of contempts the libelous or slanderous publication must relate to *judicial action;* that it must have reference to a judicial decision, order or proceeding in a cause pending or completed. There is, we believe, but one case of this kind in the United States wherein the contempt charged did not refer in some way to a specific cause or to specified judicial proceedings, viz.: *In re Moore,* 63 N. C. 397.

But that case is doubtful authority for any purpose. Upon learning of the obnoxious publication, the supreme court of North Carolina first, without notice or hearing of any kind, entered an order disbarring certain of the attorneys signing it, but generously giving them leave to show cause why they should not remain disbarred. The court then held that the offense was purely one of intention; that the party charged "is allowed to try himself"; and that disavowal of libelous intent *must* be accepted as a full and complete vindication. The proceedings would seem to be more in the nature of disbarment than of contempt; though the peculiar manner of conducting them is, from either point of view, certainly without parallel or precedent.

The decisions in this country will be searched in vain for a case where the publication of matter relating to the judge while acting in a purely *ministerial* capacity was declared a contempt.

Webster defines the word "ministerial" as follows: "Pertaining to executive offices as distinguished from judicial; administrative." And he gives as an illustration the following from Bacon's Abridgment: "For the ministerial offices in court, there must be an eye to them."

The performance of ministerial duties is frequently devolved upon judicial officers; as for instance, the appointment formerly by the judges of this court of public trustees in certain counties of the state. And because by statute a duty may be devolved upon the judge, such duty is not thus necessarily made a judicial function. Judicial functions are determined by the intrinsic character of the duty or act itself, and not by the character of the official designated to perform it.

An act in the performance of a ministerial duty is imperative; it is done in obedience to some legal mandate; it involves the exercise of no official discretion and of no judgment as to the propriety of the act. In these respects it is wholly unlike an act in the performance of judicial duties.

"A ministerial act may be defined to be one which the person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done."—Bouvier's L. D. 415, 27 Cyc. 793.

"When an officer acts in both a judicial and ministerial capacity he may be compelled to perform the ministerial acts in a particular way, but when he acts in a judicial capacity he can only be required to proceed; the manner of doing so is left entirely to his judgment."—Bouvier 416.

Referring to the appointment of appraisers by justices of the peace, the court says:

"It is a sufficient answer to this exception that

this court has repeatedly held that the justice in proceedings of this nature acts ministerially, not judicially."—*Crane v. Camp*, 12 Conn. 467.

"Where the act to be done is of a judicial nature the justices must both be present at it, as in the instances put in the text   *   *   *;   but where the act to be done is merely ministerial, the concurrence of the justices together is not requisite; as, it seems, in the allowance of a poor rate."—Bacon's Abridgment 410.

The duty of keeping accounts of his fees, emoluments, expenditures, etc., and the responsibility of having those accounts accurate and truthful, are devolved upon the county "judge" by statute. This duty and this responsibility are ministerial; there is no room for the exercise of discretion, or of judgment, except in minor details of performance.

In courts of record these duties are generally performed by a ministerial officer called the "clerk." But a contempt proceeding could not be based upon a newspaper stricture touching the clerk's integrity or method of keeping those accounts and handling those funds. And devolving this duty upon the county judge does not change the character of the function; it is still a ministerial and not a judicial duty.

The law of Virginia devolved upon the county judge the duty of selecting jurors to serve in the circuit and county courts. Cole, being a county judge, was indicted in the federal court for malconduct in the performance of this duty. Responding to the argument that he was discharging a judicial function and hence could not be held responsible therefor, the supreme court of the United States employs the following language:

"It was insisted during the argument on behalf of the petitioner that congress cannot punish a state

judge for his official acts; and it was assumed that Judge Cole, in selecting the jury as he did, was performing a judicial act. This assumption cannot be admitted. Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. * * * It is merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy."—*Ex Parte,* Va. 100 U. S. 348.

The very fact that the statute provides for auditing, correcting, and adjusting the accounts of the county judge by the county commissioners, is proof conclusive that the keeping of those accounts is not a judicial function. If it were such a function, the acts of that official could not be thus supervised and controlled, and, as counsel for respondent suggest, he might misappropriate the funds with impunity; incurring no liability, save possibly that of impeachment. For a judge cannot be prosecuted or held in damages for his acts in the performance of his judicial duties.—*Bradley v. Fisher,* 13 Wall. 335; *Raines v. Simpson,* 50 Tex. 501. If he could be thus held responsible, the bench would go begging, for no one would accept the office and incur the onerous and hazardous risk.

Again, the statute requiring the county judge to keep "a full, true, accurate and minute account of all fees and emoluments of his office," and also of all expenditures for clerk hire and other expenses, does not apply to him alone. The same identical provision extends to county clerks, treasurers, sheriffs, justices of the peace, and constables; so, likewise,

does the provision making it the duty of the board of county commissioners to audit, correct and adjust the accounts of the county judge.—3 Mills' Ann. Stats., §§ 1936z, 1936a1, 1936b1.

This is, in effect, a legislative declaration of the character of the duty thus imposed upon the county judge. It is impossible to conclude that the legislature intended this duty to be *judicial,* or to be treated as such. If this were the intention of that body, it necessarily follows that they imposed upon the treasurer, sheriff, constable, etc., the performance of similar judicial duties.

That in all of the cases where this kind of contempt has been sustained, the publication related to judicial proceedings either past or present, in contradistinction to ministerial functions, is conclusively shown by examination of the authorities. Excepting *In re Moore, supra.,* which is above distinguished, we believe this class of cases in the United States relates universally to printed articles challenging judicial proceedings of some kind, pending or concluded.

It is urged that such a publication as the one under consideration interferes with and embarrasses the administration of justice; that it tends to bring the court and judge into disrepute; and that it destroys public confidence in both and impairs their usefulness. The correctness of these observations may be conceded. But malconduct of the judge in discharging a private trust, or false and malicious attacks upon his integrity as an individual, also reflect upon him as a public official and tend to produce the same unfortunate results. Yet no intelligent lawyer would sanction proceedings by contempt under the latter circumstances.

This extraordinary remedy is given primarily for the purpose of safeguarding the interests of

parties to judicial causes or proceedings, and secondly, for the purpose of protecting the court itself from coercion or interference while in the discharge of its judicial duties. And the fact that if the publication be false or malicious the judge will suffer injustice and injury in his official as well as in his private capacity, is not deemed sufficient to justify the invoking of this summary proceeding under circumstances such as are presented in the case at bar; a proceeding in which the injured person himself acts as judge, tries the accused in a manner largely *ex parte,* and upon conviction imposes a fine or imprisonment, or both, at discretion.

Upon the record before us we hold that the court below was without jurisdiction to pronounce judgment in this cause, and, therefore, that the same must be dismissed. If the judge of the county court suffered wrong or injury through the publication complained of, his remedies therefor are only such as may be invoked by other citizens upon similar provocation.

In view of the foregoing conclusion it is unnecessary for us to consider the additional question so strenuously argued by counsel, viz.: whether constructive contempts by publication should be limited to printed articles dealing with causes or proceedings pending and undetermined; or whether such jurisdiction may be extended to cases where the scandalous publication relates to judicial proceedings that have been finally determined and are no longer before the court. And we prefer to leave this important matter open for investigation and decision in some future case fairly involving the same.

The judgment of the county court is reversed and the cause remanded, with directions to dismiss the proceeding.        *Reversed.*

Decision *en banc.*

Mr. Justice Gabbert, Mr. Justice Goddard and Mr. Justice Bailey dissent from the opinion of the majority of the court; because, in their judgment, the article published by the plaintiff in error, which was the foundation of the action, referred to the judge in his judicial capacity.